# United States Court of Appeals
### For the Eighth Circuit

_____

No. 18-3472

_____

Kevin Chestnut

*Plaintiff - Appellee*

v.

Officer Dawain Wallace, St. Louis City Arresting Police officer, in his individual capacity

*Defendant - Appellant*

Officer Tiffany Burns, n/k/a Tiffany Porter; St. Louis City Arresting Officer, in her individual capacity; Officer John Doe, St. Louis City Arresting Police Officer, in his individual capacity; City of St. Louis, Missouri; Justin Ludwig, St. Louis City Police Officer, in his individual capacity

*Defendant*s

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 24, 2019
Filed: January 21, 2020

_____

Before GRUENDER, ARNOLD, and GRASZ, Circuit Judges.

_____

ARNOLD, Circuit Judge.

This is an interlocutory appeal from the denial of qualified immunity to a police officer who stopped, frisked, and handcuffed a person who had been watching another police officer perform traffic stops. We agree with the district court[1] that genuine issues of material fact preclude the officer from receiving qualified immunity at this stage. We therefore affirm.

According to plaintiff Kevin Chestnut, one evening around dusk he paused his jog in a St. Louis park to watch St. Louis Metropolitan Police Department Officer Leviya Graham perform a traffic stop. He watched the stop for five or ten minutes and then resumed his jog. Shortly thereafter, Chestnut stopped again to observe Graham perform another traffic stop. During this stop, Chestnut stood in a grassy area between the jogging trail and the sidewalk and leaned against a tree. He testified that he stood thirty to forty feet away and across the street from where Graham was conducting the stop. He asserts that he was watching the stops out of curiosity since there had "been a lot of difficulty in citizen/police interaction" as of late. The parties point out that this specific park had been the site of testy exchanges between police and citizens.

Chestnut caught Graham's attention. She radioed dispatch for assistance, reporting that a suspicious person had been following her to her car stops. She described Chestnut as a white male in a yellow shirt who was leaning against a tree across the street from her. Officer Dawain Wallace responded to the call and arrived on scene. From his police car, he saw someone matching Chestnut's description and shined his spotlight on him. Wallace testified at one point that either Graham or the dispatcher had said that Chestnut was "hiding in the treeline" and "kind of peeking and lurking around a tree." Chestnut, on the other hand, testified that he purposely

---

[1]The Honorable Patricia L. Cohen, United States Magistrate Judge for the Eastern District of Missouri, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

stood in a location where the headlights on Graham's car illuminated him. He said that he intentionally made himself plainly visible, that he was standing still, and that he was not interfering.

After shining his spotlight, Wallace got out of his car, approached Chestnut, and asked him for some form of identification. Chestnut had none on him, so Wallace asked him for his name, address, and social security number. Wallace maintains that he requested this information so he could determine whether Chestnut had any outstanding warrants. Chestnut provided his name and, he says, his birthday. But he agreed to provide only the last four digits of his social security number. At that point, Wallace frisked Chestnut for weapons but found none, yet he directed other officers who had arrived on scene to put Chestnut in handcuffs. Chestnut then provided his full social security number to Wallace and asked to speak to one of Wallace's supervisors. Wallace used the information to perform a warrants check, and he learned that Chestnut had no outstanding warrants. After Wallace's supervisor arrived and spoke with Chestnut, he directed that the handcuffs be removed and permitted Chestnut to leave. Chestnut estimated that the entire encounter with Wallace lasted twenty minutes.

Chestnut sued Wallace, and others not relevant to this appeal, for damages under 42 U.S.C. § 1983, alleging that Wallace detained, arrested, frisked, and handcuffed him without reasonable suspicion or probable cause to believe he had engaged in or was about to engage in unlawful conduct or that he was armed and dangerous. When Wallace moved for summary judgment on the ground of qualified immunity, a defense that protects an individual defendant from suit when his conduct does not violate clearly established constitutional rights, *see White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam), the district court denied the motion. This appeal followed.

Though we ordinarily lack jurisdiction to review the denial of a motion for summary judgment immediately because such a ruling is not a final decision, we may entertain an interlocutory appeal from an order denying qualified immunity to the extent that it raises "abstract issues of law." *Jenkins v. Univ. of Minn.*, 838 F.3d 938, 943–44 (8th Cir. 2016). We accept as true the facts that the district court found and likely assumed, but for factual disputes that the district court did not resolve, we view the record in Chestnut's favor. *See Roberts v. City of Omaha*, 723 F.3d 966, 972 (8th Cir. 2013). We review the district court's decision de novo. *Nord v. Walsh Cty.*, 757 F.3d 734, 738 (8th Cir. 2014).

Before reaching the heart of this appeal, we briefly address Chestnut's contention that he was arrested, rather than merely detained. The distinction matters under the Fourth Amendment. An arrest is valid only if there is probable cause to believe that a suspect has committed or is about to commit a crime, whereas a brief, investigatory detention can be based on only a reasonable suspicion that criminal activity is afoot. *See Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019). A detention can become an arrest if it "lasts for an unreasonably long time or if officers use unreasonable force." *Id.* at 737. Though the line between the two can be hazy, we think our precedent squarely places Chestnut's seizure on the detention side of the line. The *Waters* case involved a twenty-minute interaction that was arguably more intrusive than the one here (the suspect was placed in a police car for twenty minutes while handcuffed), and yet we held that the suspect had only been detained. *Id.* at 736–37. We see no reason why *Waters* does not control, and so we conclude that Chestnut's detention did not become an arrest.

To detain someone temporarily, officers need only reasonable suspicion that criminal activity is afoot based on the attendant circumstances. *Id.* at 736. The inquiry deals with probabilities, not hard certainties, *see United States v. Cortez*, 449 U.S. 411, 418 (1981), and it need not rule out innocent conduct. *Navarette v. California*,

572 U.S. 393, 403 (2014). Reasonable suspicion is based on commonsense judgments about human behavior. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

In his brief, Wallace maintains that the law was not clearly established when he detained Chestnut that he violated the constitution "by conducting an investigatory stop and briefly handcuffing a suspect with no identification after he follows a female police officer, seemingly obscures himself in a dark area of a public park after nightfall to watch her, and then fails to cooperate with the officer's investigation by refusing to provide his social security number." We have some difficulties with Wallace's legal argument and with his description of the circumstances.

First, Chestnut's refusal to supply his full social security number to a police officer during a consensual encounter should not have contributed to Wallace's reasonable suspicions. If "a person's decision during a consensual police encounter to ignore the police and go about his business" cannot be considered in the reasonable-suspicion calculus, *see United States v. Sykes*, 914 F.3d 615, 618 (8th Cir. 2019), then a person's refusal to provide only some of the requested information cannot be either. It would make no sense to require an officer to allow someone who provides no information to walk away but then to permit an officer to detain someone who gives him only partial information. And we do not believe that the encounter became non-consensual when Wallace asked Chestnut for identifying information. As the Supreme Court has explained, "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure," so "a police officer is free to ask a person for identification without implicating the Fourth Amendment." *See Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185 (2004).

Second, it is disputed whether Chestnut obscured himself in a dark area of the park to watch Graham. Chestnut says he purposely remained visible and in the open, illuminated by Graham's headlights. We take the facts in a light most favorable to

Chestnut, *see Roberts*, 723 F.3d at 972, and to the extent Wallace's argument is premised on this factual dispute, we would lack jurisdiction over his appeal. *See Thompson v. Dill*, 930 F.3d 1008, 1012 (8th Cir. 2019). The dissent seeks to justify the seizure because Wallace could reasonably suspect that Chestnut was intent on criminal conduct since "individuals who are merely interested in police conduct generally make their presence more apparent." But Chestnut says he was apparent and at this stage we must take him at his word. The dissent opines that Chestnut's description of where he was standing merely reflected his "subjective intent." With respect, we disagree. Chestnut testified to physical facts, not his intent: He described where he was standing and stated he was visible. He also stated that there was still light outside when he was watching Graham, so we cannot say at this point, as the dissent does, that Chestnut "was following her into the night as she made her stops." Simply put, there are issues of fact here.

It appears Wallace may also be challenging the denial of qualified immunity even when the facts are properly viewed in Chestnut's favor—a matter over which we do have jurisdiction. But we agree with the district court that if we view the facts that way, Wallace violated Chestnut's clearly established constitutional rights. *See Walker v. City of Pine Bluff*, 414 F.3d 989 (8th Cir. 2005). In *Walker*, attorney John Walker observed an encounter between police and some young men. We said that "Walker stood with his arms folded some forty to fifty feet from the conversation between the police and the young men" and did not speak to anyone. When officers asked him what he was doing, he responded that he was watching the town's "finest in action." After further conversation, Walker identified himself as an attorney and offered his driver's license to one of the officers, but the officer instead handcuffed Walker, put him in the back of a hot police car for twenty minutes, and drove him to the police station. Walker was charged with obstructing governmental operations. The purely legal question was whether the officer "had arguable probable cause to arrest Walker for obstructing governmental operations because Walker distracted officers who were

conducting a traffic stop by silently watching the encounter from across the street with his arms folded in a disapproving manner." *Id.* at 992.

In ruling for Walker, we explained that "[i]n a democracy, public officials have no general privilege to avoid publicity and embarrassment by preventing public scrutiny of their actions." We noted that "public police activity invariably draws a crowd of interested but benign on-lookers," and we thought it "preposterous" that a "silent, non-interfering on-looker" could have distracted the officers from safely completing the traffic stop. We concluded that "[n]o reasonable police officer could believe that he had arguable probable cause to arrest such an on-looker in this situation, for obstruction of governmental operations or for any other purported crime," so the district court properly had rejected the officer's request for qualified immunity. *Id.* at 992–93.

Taking the facts in Chestnut's favor, we think *Walker* establishes that Wallace violated Chestnut's clearly established right to watch police-citizen interactions at a distance and without interfering. The dissent says our definition of the right is defined too abstractly, at too high a level of generality. We respectfully disagree. We think we have correctly characterized the principle acted on in *Walker*, and thus the right in question, and we conclude that Chestnut has carried his burden to show that *Walker* clearly establishes such a right.

Wallace tries to distinguish *Walker* on several grounds, but we find none of them persuasive. He maintains that *Walker* involved an arrest, whereas Chestnut was only detained. But the same facts that led us to conclude that it was clearly unlawful to arrest Walker lead us to conclude it was likewise clearly unlawful for Wallace to detain Chestnut; in both cases, no reasonable officer could conclude that a citizen's passive observation of a police-citizen interaction from a distance was criminal. We think it is legally irrelevant that Chestnut did not undergo similar post-seizure experiences as Walker, such as being placed in a hot police car, taken to the police

-7-

station, or charged with a crime: This case is about the facts that existed when Chestnut was seized. Nor do we place any weight on the fact that Walker provided identification when Chestnut did not, for the reasons already stated. In short, we think *Walker* puts this constitutional question beyond debate, *see White*, 137 S. Ct. at 551, and we can't see how applying *Walker* means that we are requiring police officers "to parse fine distinctions between statutory and constitutional law in split-second decisions," as the dissent maintains. Respectfully, it is the distinctions that Wallace invites us to draw between our case and *Walker* that are too fine and irrelevant.

Other legal authorities fully support our holding that the right here was clearly established. Every circuit court to have considered the question has held that a person has the right to record police activity in public. *See, e.g., Fields v. City of Philadelphia*, 862 F.3d 353, 355–56 (3d Cir. 2017). Four circuits had so decided by the time of the events in question here. *See ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012); *Glik v. Cunniffe*, 655 F.3d 78, 82–83 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995). This robust consensus of cases of persuasive authority suggests that, if the constitution protects one who records police activity, then surely it protects one who merely observes it—a necessary prerequisite to recording. Our circuit in particular has been quite forthright in upholding the right of citizens to engage with officers while they perform their duties. For example, in *Hoyland v. McMenomy*, we held that officers did not have qualified immunity to arrest a man who had watched officers arrest his wife and even shouted at them. 869 F.3d 644, 654–55 (8th Cir. 2017). We acknowledged that the man "was shouting criticisms at the officers" while they tried to effect an arrest, but we adverted to the principle from *Walker* that public officials have no privilege to avoid public scrutiny and criticism of their actions. *Id.* And we did so despite "[a]ny fear of danger the officers felt due to Hoyland's presence." *Id.* at 654. In *Thurairajah v. City of Fort Smith*, we affirmed the denial of qualified immunity against an officer who arrested a man who drove by

the officer while the officer performed a traffic stop and shouted an obscenity. 925 F.3d 979, 983–84 (8th Cir. 2019). Surely if officers cannot seize someone who criticizes or curses at them while they perform official duties, they cannot seize someone for exercising the necessarily included right to observe the police in public from a distance and without interfering.

The dissent explicitly agrees with our characterization of these cases, but it argues "that factual distinctions matter greatly in delimiting the right." We agree. But it supports its argument with a case, *Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017), that is distinguishable. In that case, a man recorded the exterior of a police station. The facts do not indicate that he recorded any police-citizen interactions or any other public police activity. The case therefore presents a much different question from ours, though we point out that that court, like every other circuit court that has considered the question, held that there was a constitutional right to record police activity. *See id.* at 688.

Contrary to the dissent's suggestion, we do not hold that Wallace was prohibited from investigating Graham's concerns; he could certainly have asked Graham for more details, kept a close watch on Chestnut, or approached and spoken with him about his presence in the park. We merely hold that it was clearly established that he could not detain him without more indication of wrongdoing. And since Wallace could not have reasonably believed that Chestnut was engaged or about to engage in criminal behavior, we think that it was also beyond debate that Wallace should not have believed that Chestnut was armed and dangerous, which would have justified him being frisked and handcuffed. *See El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011). By all accounts, Chestnut was calm during the incident and did not behave erratically, nor did Wallace conduct even a basic investigation into the reasons for Chestnut's observations before frisking and handcuffing him. *Id.* at 457–58.

We think that officers should generally be allowed to believe the information that they receive from or through a dispatcher, even if it later turns out that the facts as relayed are disputed or even untrue, and that that information alone can sometimes justify a detention. *See Feathers v. Aey*, 319 F.3d 843, 851 (6th Cir. 2003). But Wallace's strategy on appeal was to assert that Chestnut was lurking in the trees (even though Chestnut says he was not), and argue that Wallace could therefore reasonably suspect Chestnut had committed or was about to commit a crime. The dissent identifies three passing statements in Wallace's briefs that might suggest he was also raising the argument that Wallace could simply rely on the information he received through dispatch to detain Chestnut, but when those statements are put in context, it's hardly clear that Wallace was making this point. The first statement was merely a factual recitation unaccompanied by legal argument. The second was offered to demonstrate that Wallace was not acting on a mere "hunch"; it was just a comment supporting Wallace's narrative that Chestnut was indeed lurking in the trees, not an independent legal discussion of the significance of information received through dispatch. And the third comment, which appeared in a reply brief footnote, merely made the point that this case did not involve anonymous tipsters. When the court asked Wallace's counsel at oral argument whether she was pressing the argument about relying on information learned through dispatch, Wallace's counsel agreed that the court was "correct that that argument was not addressed to a significant extent in the briefing." Oral Argument at 2:15–2:47. That was an understatement. There was no discussion of the issue at all and not a single citation to authorities. As our court recently said, "we regularly decline to consider cursory or summary arguments that are unsupported by citations to legal authorities." *Heuton v. Ford Motor Co.*, 930 F.3d 1015, 1023 (8th Cir. 2019). We should do so here.

Even if we assume that Wallace sufficiently raised this contention, we would decline to hold that he had constitutionally sufficient reasons to seize Chestnut. While Wallace testified that he learned through dispatch that Chestnut was "hiding," "lurking," or "peeking" around trees, assertions that he repeats liberally in his briefs,

the audio recording of the radio conversations undermines his testimony. The only relevant information relayed to Wallace was that Graham said Chestnut was "suspicious" and was following her as she performed traffic stops. A vague, conclusory statement that a person is suspicious is insufficiently specific to support his detention by the police, and merely observing police officers at work cannot give rise to a reasonable inference that criminal mischief is afoot. Graham did say that Chestnut was "leaning against a tree," but this seems rather to indicate a casual observer, not a threatening presence. There is no mention of "hiding" or "lurking" or "peeking."

We also respectfully disagree with the dissent that "Chestnut's location in a neighborhood where police had recently faced violent attacks reinforced the officers' concerns." Wallace merely noted in his opening brief that these police-citizen exchanges had occurred; he did not argue until his reply brief that they were relevant to his reasonable suspicion. "[W]e generally do not consider arguments made for the first time in a reply brief." *MBI Energy Servs. v. Hoch*, 929 F.3d 506, 512 (8th Cir. 2019). In any case, those interactions could make only the most marginal contribution to justifying what Wallace did. They occurred three months earlier than the events giving rise to this case, no injuries occurred, and their circumstances were fundamentally different: The exchanges involved large-scale civil unrest, not a single citizen simply observing the police at work. They cannot tip the balance in Wallace's favor.

We observe in closing that the fact-finder at trial may determine that Chestnut was indeed lurking in the woods, or at least otherwise disagree with Chestnut's telling of the night's events, in which case Wallace's detaining, handcuffing, and frisking Chestnut may have been justified. But at this stage, we must view the facts in Chestnut's favor. And though we agree with the dissent that "qualified immunity is important to society as a whole," so is the people's ability to monitor police activities to ensure that their duties are carried out responsibly.

Affirmed.

GRUENDER, Circuit Judge, dissenting.

The court affirms the district court's denial of qualified immunity to Officer Wallace regarding Chestnut's unlawful detention and arrest claim, holding that Wallace violated Chestnut's clearly established right "to watch police-citizen interactions at a distance and without interference." *Supra*, at 7. I respectfully disagree. Wallace's questioning and detention of Chestnut was not objectively unreasonable in light of clearly established law. Officer Wallace is thus entitled to qualified immunity.

I.

The Supreme Court has repeatedly instructed that "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *See, e.g.*, *Mullenix v. Luna*, 577 U.S. ---, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In analyzing whether a right was clearly established at the time of the incident, "the dispositive question is whether there was a fair and clear warning of what the Constitution requires." *Thompson v. City of Monticello*, 894 F.3d 993, 1000 (8th Cir. 2018). While a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question," *Rokusek v. Jansen*, 899 F.3d 544, 548 (8th Cir. 2018), "clearly established law" may not be defined "at a high level of generality," *White v. Pauly*, 580 U.S. ---, 137 S. Ct. 548, 552 (2017) (per curiam). It is the plaintiff's burden to demonstrate that the law is clearly established. *See Morgan v. Robinson*, 920 F.3d 521, 524 (8th Cir. 2019) (en banc).

In the Fourth Amendment context, whether a right was clearly established at the time the defendant acted requires an assessment of whether the official's conduct

would have been objectively unreasonable at the time of the incident. *Waters v. Madson*, 921 F.3d 725, 734-35 (8th Cir. 2019); *Turner v. Lieutenant Driver*, 848 F.3d 678, 691 (5th Cir. 2017). Courts must ask whether the law so clearly and unambiguously prohibited the conduct that "*every* 'reasonable official would [have understood] that what he is doing violates'" the law. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alteration in original) (emphasis added) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This instruction means that "clearly established law must be 'particularized' to the facts of the case," *White*, 137 S. Ct. at 552 (quoting *Anderson* 483 U.S. at 640), and the Supreme Court has repeatedly emphasized that factual "specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts," *Mullenix*, 136 S. Ct. at 308 (internal quotation marks and brackets omitted).

An officer may conduct an investigative stop and brief detention when he "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *United States v. Dortch*, 868 F.3d 674, 678 (8th Cir. 2017). To determine whether an investigative stop is reasonable, we examine "whether the officer's action was justified at its inception" and "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Wilson v. Lamp*, 901 F.3d 981, 986 (8th Cir. 2018) (quoting *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)). "While reasonable suspicion must be more than an inchoate hunch, the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *United States v. Riley*, 684 F.3d 758, 763 (8th Cir. 2012) (internal quotation marks omitted). If we determine that an officer lacked reasonable suspicion, he "may nonetheless be entitled to qualified immunity if [he] had *arguable* reasonable suspicion—that is, if a reasonable officer in the same position could have believed [he] had reasonable suspicion." *Waters*, 921 F.3d at 736.

The court first finds that Wallace violated Chestnut's Fourth Amendment right to be free from detention absent reasonable suspicion. *Supra*, at 7. According to the court, this is because *Walker v. City of Pine Bluff*, 414 F.3d 989 (8th Cir. 2005), established that no reasonable officer could have suspected that Chestnut had committed or was about to commit a crime because Chestnut had a right to observe police conduct. But to reach its conclusion that Wallace acted unreasonably, the majority defines the right at a high level of generality, ignoring the arguable reasonableness of Wallace's actions under the circumstances. Viewed in light of the totality of the circumstances, I do not believe that Officer Wallace's actions violated law clearly established by *Walker* or any other case.

In *Walker*, we concluded that police acted unreasonably when they arrested John Walker, an individual who, while observing police at a traffic stop, "stood at a considerable distance from police officers," "spoke only when spoken to," and "complied with [the officer's] request for identification." *Walker*, 414 F.3d at 993. Notably, Walker only observed one traffic stop, he did not follow an officer in the dark, he was accompanied by his daughter and two grandchildren, and he stood across the street in view of the officers. *Id.* at 992. In response, the police handcuffed him, kept him in a hot patrol car for twenty minutes, and then drove him to the police station. *Id.* We determined that the police violated clearly established law because no officer could have believed he had probable cause to arrest Walker for obstructing police operations or for any other crime. *Id.* at 993.

The facts in this case differ materially. At 5:57 p.m. on February 6, 2015, Officer Wallace heard Officer Leviya Graham radio dispatch for backup on her patrol. Chestnut's stipulated statement of the undisputed facts includes a transcript of that call, which provides that Officer Graham informed other officers that she had a "suspicious person" "standing across the street" and "leaning up against a tree" who was "following [her] to all [of her] car stops." She requested an "assist"—a term officers testified meant that she needed another officer to investigate because she

could not handle the situation alone. Officer Graham had been followed by a male suspect from stop to stop once before in the neighborhood, resulting in an arrest after the man became belligerent, and the neighborhood was also one in which police had recently faced violent attacks. Wallace reacted quickly, arriving at Tower Grove Park at roughly 6:00 p.m., within minutes of Graham's call.

Upon arriving at the scene, Wallace observed Chestnut standing under a tree in the park, watching Officer Graham. Because it was almost completely dark, he aimed his spotlight at Chestnut.[2] Wallace then approached Chestnut to investigate further. When Chestnut said he did not have identification, Wallace asked him to provide other identifying information, including his Social Security Number. Chestnut refused, and Wallace frisked Chestnut. Wallace did not find a weapon, but he ordered the other officers, who by then had arrived at the scene, to place Chestnut in handcuffs. Chestnut then asked to speak with a supervisor, and as they waited for the supervisor to arrive, he eventually provided his Social Security Number. Approximately ten minutes into the encounter, Sergeant Fred Lathan, the supervisor on duty, arrived and spoke with Chestnut for five to eight minutes. By then, Wallace

---

[2]The court's analysis appears to turn in part on the fact that Chestnut claims he did not *position* himself in the shadows. *Supra*, at 5-6. But his subjective intent is irrelevant to this court's consideration. Although we view the record in the light most favorable to the non-moving party, we "consider[] only the facts that were knowable to the defendant officers" at the time of the incident. *White*, 137 S. Ct. at 550. As Chestnut admitted in his Response to Defendant's Statement of Material Undisputed Facts, "[t]hat portion of Tower Grove Park is tree-lined, so anybody standing in that location is standing in the shadow of trees." Further, he admitted it was dark when Wallace arrived on the scene. And while he claimed he "wanted to be visible" and thought he "should be visible," he also acknowledged that he "d[idn't] recall lights flooding on [him]" before Wallace shined his patrol car spotlight on him. Even if Chestnut was visible, a reasonable officer could have determined that his location in the shadows of the treeline at night—and not on the nearby sidewalk—was unusual and, when viewed in combination with other information, was suggestive of criminal activity. *See United States v. Dawdy*, 46 F.3d 1427, 1428-30 (8th Cir. 1995).

-15-

had completed a warrant search, and Sergeant Lathan ordered the officers to release Chestnut. The entire encounter lasted less than twenty minutes and the officers never moved Chestnut from the location where they found him.

It is hard to blame Wallace for "missing the parallel" between *Walker* and this case; I do not see it either. *Cf. al-Kidd*, 563 U.S. at 742. In sum, Wallace received a suspicious-person call from a female officer suggesting a male suspect had followed her to all of her car stops on a winter night through a park in an area that had recently experienced police violence. In response, he conducted a brief investigative stop to determine whether Chestnut presented a threat to officer safety. He did not move Chestnut, place him in his squad car, or drive him to the police station. Thus, *Walker*—a case where police arrested an individual who they observed pause on the street with his family to observe a single traffic stop—does not provide obvious guidance for this case.

As we stated in *Walker*, whether an officer has reason to investigate an on-looker is a "complex" question because "some on-lookers may create safety hazards, while others may seek to frustrate valid law enforcement." *Walker*, 414 F.3d at 993. This acknowledged complexity must mean that there are times when police are justified in investigating an individual who observes their conduct. Though we "do not require a case directly on point" for a right to be clearly established, *Mullenix*, 136 S. Ct. at 308, *Walker* is "too factually distinct to speak clearly to the specific circumstances here," *id.* at 312, and it "shed[s] little light on whether the far greater danger" of an individual potentially stalking an officer by following her from stop to stop at nightfall is sufficiently threatening to warrant a reasonable suspicion of criminality—itself a less stringent standard than the arguable probable cause required to justify the officers' actions in *Walker*. *See id*.

The court does not explain why the distinctions between this case and *Walker* fail to sufficiently distinguish it. Instead, it says it is unconvinced by Wallace's

-16-

attempt to do so. *Supra*, at 7. Yet Wallace does not bear the burden to show that these cases are too distinct to provide obvious guidance; Chestnut has the burden to prove they are sufficiently similar. *See Morgan*, 920 F.3d at 524. We cannot—and should not—shift that burden. In light of the dissimilarities in these cases, I do not believe that *Walker* put "beyond debate" what the law required in the circumstances Wallace faced. *See al-Kidd*, 563 U.S. at 741.

In an effort to support its finding that Wallace violated clearly established law, the court turns away from *Walker* to an argument Chestnut does not advance: that a consensus of cases from other circuits establishing that the Constitution protects those who video record police activity as long as they do not interfere with police duties also includes the right to merely observe police conduct. *Supra*, at 8-9. I agree with the court's characterization of those cases. But—again—the fact that a certain right exists does not mean it is without limits, nor does it necessarily indicate that it is obvious how the right applies to a certain set of facts. *Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017), a recent Fifth Circuit case considering the right to record the police, illustrates that factual distinctions matter greatly in delimiting the right. There, officers observed an individual videotaping the Fort Worth Police Station from a sidewalk across the street from the station. *Id.* at 683. Officers approached, questioned, and detained the on-looker, eventually handcuffing him and placing him in the back of a patrol car. *Id.* The court found that, because of the unusual nature of where and what he was recording, "[a]n objectively reasonable person in [the officers'] position could have suspected that Turner was casing the station for an attack, *stalking an officer*, or otherwise preparing for criminal activity, and thus could have found Turner's filming of the 'routine activities' of the station sufficiently suspicious to warrant questioning and a brief detention." *Id.* at 692 (emphasis added).

Likewise, under the circumstances presented here, a reasonable officer could believe it would not violate clearly established law to conduct an investigative stop.

-17-

Officer Graham's call suggested Chestnut was more than merely a passive on-looker "observing police officers at work." *Supra*, at 11. Quite differently, he was following her into the night as she made her stops.[3] *See United States v. Ortiz-Monroy*, 332 F.3d 525, 529 (8th Cir. 2003) ("[A]n officer may rely on information provided by other officers and all the information known to a team of officers . . . to provide justification for a stop."). Wallace stated that he too found Chestnut's behavior suspicious because, in his experience, individuals who are merely interested in police conduct generally make their presence more apparent and do not follow officers from stop to stop. *See United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998) ("We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals."). And Chestnut's location in a neighborhood where police had recently faced violent attacks reinforced the officers'

---

[3]I respectfully disagree with the court that Officer Wallace does not argue that he was entitled to rely on information relayed in Officer Graham's dispatch call. *See* Brief of Appellant at 28, *Chestnut v. Wallace*, No. 18-3472 (8th Cir. Jan. 3, 2018) (arguing that Wallace had reasonable suspicion because "Wallace had received a call to assist Officer Graham because she was being followed by an unidentified man while she conducted routine traffic stops"); *id.* at 31 ("Officer Graham's report that Chestnut had been following her and his location in a dark area of a park after nightfall are specific, articulable facts, which Wallace relied upon in concluding that Chestnut could potentially be preparing to engage in criminal activity."); Reply Brief of Appellant at 10 n.2, *Chestnut v. Wallace*, No. 18-3472 (8th Cir. Mar. 25, 2019) ("Wallace was entitled to rely on Officer Graham's report as amounting to more than an anonymous tip . . . ."); Oral Argument at 2:04-4:20, *Chestnut v. Wallace*, No. 18-3472 (8th Cir. Sept. 24, 2019) (arguing the same). Officer Wallace himself testified that he relied on the information provided by Officer Graham. And respectfully, because this argument is advanced within Wallace's Fourth Amendment reasonableness claim, it is one that, under the totality of the circumstances test, we may not simply ignore. *See United States v. Arvizu*, 534 U.S. 266, 273-75 (2002).

concerns.[4]  *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (noting that it is reasonable for an officer to consider "the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation").

The court determines that Chestnut's conduct suggested he was just as likely to be a "casual observer" as he was to be "a threatening presence." *Supra*, at 11. Sure, he followed a police officer from stop to stop on a winter night through a dark park, but that alone is not criminal. Neither is his presence along the darkened treeline. After all, one man's shadowy treeline is another man's shade tree. But that Chestnut's conduct was susceptible to innocent explanation is not determinative of whether a reasonable officer could have suspected he intended harm. Even a combination of innocent conduct can suffice to support a reasonable suspicion of criminal activity. *See Wardlow*, 528 U.S. at 125 (explaining that even in *Terry*, the conduct at issue—walking on the sidewalk and pausing repeatedly in front of a storefront window—was "lawful" and "susceptible to innocent explanation," but when viewed from the perspective of an experienced officer, this repetitive action "also suggested that the individuals were casing the store for a planned robbery").

"While reasonable suspicion must be more than an inchoate hunch, the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *Riley*, 684 F.3d at 763 (internal quotation marks omitted).

---

[4]Although the court suggests Wallace did not make this argument in his opening brief, Wallace explained that Graham's concern was heightened because of the recent violence in the Tower Grove neighborhood, and Wallace repeatedly argued that he was entitled to take into account Chestnut's location as part of his assessment of the totality of the circumstances. And even if the court is correct that the recent violence could make only a "marginal contribution" to the reasonableness of Wallace's suspicions, *supra* at 11, that distinction is merely one of many in a long list that distinguishes the reasonableness of Wallace's conduct from that of the officers in *Walker*.

Examining the totality of the circumstances, I cannot say that Wallace's initial questioning and detention of Chestnut was objectively unreasonable in light of clearly established law. *See Waters*, 921 F.3d at 736.

## II.

That Wallace did not violate clearly established law by deciding to conduct an investigative stop does not fully resolve our inquiry. Chestnut also argues that *El-Ghazzawy v. Berthiaume*, 636 F.3d 452 (8th Cir. 2011), confirms that even if Wallace had a reasonable suspicion to stop him, Wallace violated the Fourth Amendment by frisking, handcuffing, and prolonging his detention because the manner in which the stop was conducted was unreasonable. We determine whether an initially reasonable investigative stop became unreasonable by examining whether the officer's investigation was "excessively intrusive in its scope or manner of execution," *El-Ghazzawy*, 636 F.3d at 457, looking to factors such as whether the stop lasted an unreasonably long time or whether officers used unreasonable force, *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010).

Here, the duration of the stop was not objectively unreasonable in light of clearly established law because Chestnut contributed to any delay. Chestnut requested to speak to a supervisor, and a reasonable police officer in that situation could believe that waiting for the supervisor to arrive at the scene did not transform Chestnut's detention into a *de facto* arrest. *See Cady v. Sheahan*, 467 F.3d 1057, 1063 (7th Cir. 2006) (noting that plaintiff's refusal to provide identification, request to speak with a supervisor, and extended discussion with law enforcement regarding court precedent extended stop—not law enforcement's investigatory measures).

Chestnut also prolonged the stop by refusing to provide identifying information, preventing officers from verifying his identity and determining whether he had any outstanding warrants. *See Waters*, 921 F.3d at 737 (finding twenty-minute

detention reasonable when suspect refused to identify himself).  While the court suggests that this should not have factored into Wallace's suspicions because Chestnut had a right to refuse to answer all of Wallace's questions, *supra*, at 5, "[t]he totality-of-the-circumstances test precludes this sort of divide-and-conquer analysis," *United States v. Collins*, 883 F.3d 1029, 1031 (8th Cir. 2018) (internal quotation marks omitted).  It is true that a refusal to identify oneself, "*without more*, does not furnish the minimal level of objective justification needed for a detention or seizure," *Wardlow*, 528 U.S. at 125 (emphasis added) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)), but where officers already possess "articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information," *Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 186 (2004) (quoting *Hayes v. Florida*, 470 U.S. 811, 816 (1985)).  An objectively reasonable officer could have believed it was lawful to continue to detain Chestnut in light of his refusal to provide requested identifying information and his demand to speak with a supervisor.

Next, Chestnut argues that Officer Wallace's decision to handcuff him was unnecessarily intrusive because, after he frisked him, Wallace knew Chestnut was unarmed.  This is a closer question, but I ultimately conclude Wallace's decision was not objectively unreasonable in light of clearly established law.[5]  Chestnut again both overstates our holding and misstates our analysis in *El-Ghazzawy*.

---

[5]The court concludes that Wallace's decision to briefly detain, frisk, and handcuff Chestnut did not ripen the encounter into a *de facto* arrest.  *Supra*, at 4.  Because an investigative stop "may become an arrest, requiring probable cause, if the stop lasts for an unreasonably long time or if officers use unreasonable force," *Waters*, 921 F.3d at 737, I take the court to mean that if it had concluded Wallace had a reasonable, articulable suspicion that Chestnut was a threat to officer safety, it would agree that his decision to frisk, handcuff, and briefly detain Chestnut was not objectively unreasonable in light of clearly established law, *see United States v. Smith*, 645 F.3d 998 (8th Cir. 2011).

In *El-Ghazzawy*, this court denied qualified immunity to an officer, who, after immediately arriving at a suspected crime scene, handcuffed the suspect without any investigation. 636 F.3d at 454-55. There, we relied not only on the fact that the officer had no indication that the suspect was armed but also considered that the suspected crime did not necessarily involve a weapon, the suspect exhibited no suspicious behavior and cooperated with officers throughout the incident, the officer failed to conduct any investigation before handcuffing the suspect, and no exigent circumstances existed to justify handcuffing the suspect since the suspected crime had already occurred and evidence was in police possession. *Id.* at 457-58; *see also Waters*, 921 F.3d at 737-38 (identifying the five factors on which the *El-Ghazzawy* court relied). Indeed, contrary to Chestnut's claims, this circuit and others have emphasized that some circumstances may justify a brief handcuffing even after a search has demonstrated the suspect is not armed. *See, e.g.*, *Waters*, 921 F.3d at 732, 737-38; *El-Ghazzawy*, 636 F.3d at 457 ("[F]or the use of handcuffs during a *Terry* stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case."); *United States v. Bailey*, 743 F.3d 322, 340 (2d Cir. 2014) ("[T]he government may be able to point to circumstances supporting a reasonable basis to think that even an unarmed person poses a present physical threat or flight risk warranting handcuffing.").

Here, Wallace testified that he thought Chestnut could be a threat even if he did not have a weapon on his person, and he concluded that a brief handcuffing would be best for both his and Chestnut's safety while he and other officers investigated. Given what Wallace knew, his safety concern was not unreasonable, and he did not violate clearly established law in responding to that concern by concluding that a brief handcuffing was "reasonably necessary . . . to maintain the status quo" while officers worked in a dark park to identify Chestnut. *Waters*, 921 F.3d at 737. Importantly, Wallace did not move Chestnut, place him in a patrol car, or drive him to the police station. *Cf. Walker*, 414 F.3d at 992. Although others may have

-22-

concluded a brief handcuffing was unnecessary under the circumstances, in evaluating Fourth Amendment reasonableness, "[t]he question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *United States v. Sharpe*, 470 U.S. 675, 687 (1985). I cannot say that only someone "plainly incompetent" or who "knowingly violate[s] the law" would have acted as Wallace did. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986). Accordingly, Officer Wallace is entitled to qualified immunity.

## III.

In recent years, the Supreme Court has issued several decisions reversing denials of qualified immunity by the courts of appeals. The Court found those reversals "necessary both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *White*, 137 S. Ct. at 551 (internal quotation marks and citations omitted). We should hew closely to the wisdom of this instruction and to the counsel of our own precedent which emphasizes that officers in the line of duty are not "participating in a law school seminar." *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1108 (8th Cir. 2004). It is thus worth emphasizing again that police officers are not—and should not be—expected to parse fine distinctions between statutory and constitutional law in split-second decisions. *See id.*

Because there is no authority that would have given Officer Wallace notice that it was a Fourth Amendment violation to conduct an investigative stop in the manner he did under the circumstances presented in this case, I respectfully dissent.

—————————————————