# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-1830

_____

Sarah K. Molina; Christina Vogel; Peter Groce

*Plaintiffs - Appellees*

v.

City of St. Louis, Missouri; County of St. Clair, Illinois; John Doe, I-VI

*Defendants*

Daniel Book, in his individual capacity; Joseph Busso, in his individual capacity

*Defendants - Appellants*

Jason C. Chambers

*Defendant*

Lance Coats, in his individual capacity; Stephen Dodge, in his individual capacity; Joseph Mader, in his individual capacity; Michael D. Mayo, in his individual capacity; Mark S. Seper, in his individual capacity; William Wethington, in his individual capacity

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 12, 2022
Filed: February 2, 2023
_____

Before BENTON, SHEPHERD, and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

Officers in an armored police vehicle shot tear gas at three people near the scene of a protest in downtown St. Louis. The district court concluded that all three had a First Amendment retaliation claim. We agree that one of them does, but qualified immunity shields the officers from the claims brought by the others. We affirm in part, reverse in part, and remand.

I.

A large protest broke out in St. Louis in 2015. In the crowd were Sarah Molina and Christina Vogel, both members of the National Lawyers Guild. In Molina's words, their goal was to "protect[] the right to protest," not to participate in one. To make their self-appointed role known, they wore bright green hats emblazoned with the words "National Lawyers Guild Legal Observer."

During the protest, St. Louis police officers formed a line and repeatedly ordered the crowd to disperse. Instead of leaving, the protestors responded by throwing rocks and bottles. The officers warned protestors about the possible use of chemical agents, and when they refused to go, shot inert smoke canisters into the crowd.

Vogel recorded these events as Molina stood nearby and watched. Once officers switched to tear gas, the two women left. A few minutes later, they reassembled with five to ten others on Molina's property, located about 550 feet away.

Minutes later, an armored vehicle known as the BEAR barreled down the street toward them. As it drove past, tear-gas canisters landed near Molina and Vogel. Although the officers would later deny shooting chemicals from the BEAR, an after-action report revealed otherwise.

As the BEAR continued down the street, Peter Groce followed on a bicycle. Once it stopped, he approached and shouted, "[g]et the fuck out of my park." The officers responded by launching a tear-gas canister that allegedly hit him in the hip.

Molina, Vogel, and Groce sued the officers and their supervisor, Lieutenant Stephen Dodge, under 42 U.S.C. § 1983 for, among other claims, First Amendment retaliation. In the face of a summary-judgment motion seeking qualified immunity, the district court ruled that the claims could proceed to a jury. The officers ask us to determine whether the case should have ended there.

## II.

In deciding whether the district court should have granted summary judgment, we must answer two questions. First, did the officers violate a constitutional right? Second, was the right clearly established? *See Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (en banc) (explaining that we may answer them in either order). In answering these questions, "we [must] accept as true the facts that the district court found were adequately supported, as well as the facts the district court likely assumed." *Burbridge v. City of St. Louis*, 2 F.4th 774, 779–80 (8th Cir. 2021) (bracket and quotation marks omitted) (reviewing the summary-judgment determination de novo); *see Berry v. Doss*, 900 F.3d 1017, 1021 (8th Cir. 2018) (explaining that, in an appeal from a denial of qualified immunity, we review "purely legal issue[s]" based on "the district court's factual presumptions" (quotation marks omitted)).

A.

To prevail on their retaliation claim, the plaintiffs must show that "they engaged in protected [First Amendment] activity." *Quraishi v. St. Charles County.*, 986 F.3d 831, 837 (8th Cir. 2021); *see Hoyland v. McMenomy*, 869 F.3d 644, 655 (8th Cir. 2017), *abrogated on other grounds by Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019), *as recognized in Laney v. City of St. Louis*, 56 F.4th 1153, 1157 n.2 (8th Cir. 2023). If they can make that showing, then the focus shifts to whether the officers "took [an] adverse action . . . that would chill a person of ordinary firmness from continuing in the [protected] activity." *Hoyland*, 869 F.3d at 655 (citation omitted); *see Eggenberger v. West Albany Township*, 820 F.3d 938, 943 (8th Cir. 2016). If they did, then the next hurdle is causation: was the First Amendment activity a "but-for cause" of the injury? *Nieves*, 139 S. Ct. at 1722 (quotation marks omitted).

Establishing the violation itself, however, is only half the battle. Getting past qualified immunity requires the plaintiffs to show that it would have been "sufficiently clear [to] every reasonable official . . . that what [they were] doing violate[d]" the First Amendment. *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quotation marks omitted); *Wilson v. Lamp*, 901 F.3d 981, 986 (8th Cir. 2018) (explaining that the burden remains with the plaintiffs, even at this step). "Existing precedent," in other words, must have put the issue "beyond debate." *Reichle*, 566 U.S. at 664 (quoting *al-Kidd*, 563 U.S. at 741). Although Groce gets over each of these hurdles, Molina and Vogel do not.

B.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. It protects "symbolic or expressive conduct as well as . . . actual speech." *Virginia v. Black*, 538 U.S. 343, 358 (2003). Molina and Vogel claim that the First Amendment covers what they did, which was observe and record police conduct during the St. Louis protest. Even

if we were to assume they are correct, observing and recording police-citizen interactions was not a *clearly established* First Amendment right in 2015.

Start with the Supreme Court's 50-year-old decision in *Colten v. Kentucky*, 407 U.S. 104 (1972). After a group of college students left a political demonstration in a "procession of [6] to 10" cars, a police officer pulled one of them over for an expired license plate. *Id.* at 106. A student from another car then went over to observe the traffic stop and ask questions. Eventually, other students joined him, which prompted another trooper to repeatedly ask the group to "disperse." *Id.* When those efforts failed, the officer arrested one of the students for disorderly conduct. *Id.* at 107.

Throughout trial and on appeal, the student claimed that Kentucky's disorderly-conduct statute was unconstitutionally overbroad. In concluding it was not, the Supreme Court announced that individuals "[have] no constitutional right to observe the issuance of a traffic ticket or to engage the issuing officer in conversation." *Id.* at 109. As for the student's refusal to "move on," it too was unprotected, at least "without more." *Id.* *Colten* suggests that observing police conduct is not expressive.[1]

---

[1] The dissent claims that two other cases cabin *Colten*, but neither undermines our conclusion here. *See post*, at 4–5 (citing *Hoyland*, 869 F.3d at 656, and *City of Houston v. Hill*, 482 U.S. 451 (1987)). The first one, *Houston v. Hill*, distinguished protected expression, such as "words or conduct that annoy or offend," from unprotected activities like "stand[ing] near a police officer and persistently attempt[ing] to engage the officer in conversation while the officer is directing traffic at a busy intersection." 482 U.S. at 462 n.11, 465 (citation omitted). Indeed, *Hill* even touted the disorderly conduct statute in *Colten* as an example of the kind of properly tailored statute that "infringe[d] *no* protected speech or conduct." *Id.* at 465 n.14 (emphasis added) (quoting *Colten*, 407 U.S. at 111). *Hoyland* drew a similar distinction. It contrasted a plaintiff's "exercis[e of] his First Amendment rights" to "verbally . . . oppose or challenge police action" with "simply 'refusing to move on after being directed to do so . . . without more.'" *Hoyland*, 896 F.3d at 656 (quoting *Colten*, 407 U.S. at 109). Far from ignoring precedent, as the dissent alleges, we are faithfully applying it.

None of the plaintiffs' cases clearly establish otherwise. *Walker v. City of Pine Bluff*, 414 F.3d 989 (8th Cir. 2005), is an ordinary *Fourth Amendment* case. When two police officers approached someone who had watched them conduct a traffic stop, the bystander said he had been watching "Pine Bluff's finest in action." *Id.* at 992. The officers arrested the bystander for "obstructing government operations." *Id.* at 993. Qualified immunity was unavailable, we concluded, because the officers lacked "arguable *probable cause* to arrest . . . [him] in this situation." *Id.* (emphasis added). The opinion never mentions, much less discusses, the First Amendment.

The same goes for the second case, *Chestnut v. Wallace*, 947 F.3d 1085 (8th Cir. 2020). Like *Walker*, *Chestnut* involved a bystander who watched as a police officer "perform[ed] traffic stops." *Id.* at 1087. The officer eventually called for backup because of the "suspicious person . . . following her to her car stops." *Id.* The arriving officer placed the bystander in handcuffs and detained him for about 20 minutes. *See id.* at 1087–88. We concluded there was no reasonable suspicion to conduct an investigatory stop because the bystander was not doing anything illegal. *Id.* at 1090 (stating that "no reasonable officer could conclude that a citizen's passive observation of a police-citizen interaction from a distance was criminal").

It is true, as the plaintiffs note, that some of the language in *Chestnut* was broad. Relying on a few out-of-circuit cases invoking the First Amendment, for example, we stated that there is a "clearly established right to watch police-citizen interactions at a distance and without interfering." *Id.* at 1090. But we did so based only on "the facts that existed when [the bystander] was *seized*"—a clear reference to the *Fourth Amendment* issue we were deciding. *Id.* (emphasis added). And the First Amendment cases only bolstered our (narrow) Fourth Amendment holding: "[w]e *merely* hold that it was clearly established that [a police officer] could not detain [the bystander] without more indication of wrongdoing." *Id.* at 1091 (emphasis added).

The point is that neither of these Fourth Amendment cases can clearly establish a *First Amendment* right to observe police officers.[2] *See Colten*, 407 U.S. at 109. Nor did a clearly established First Amendment right to record them exist in 2015. *See Frasier v. Evans*, 992 F.3d 1003, 1019–20 (10th Cir. 2021) (holding that a "purported First Amendment right to record [police officers] was not clearly established in August 2014"); *Fields v. City of Philadelphia*, 862 F.3d 353, 362 (3d Cir. 2017) ("[W]e cannot say that the state of the law at the time of our cases (2012 and 2013) gave fair warning so that every reasonable officer knew that, absent some sort of expressive intent, recording public police activity was constitutionally protected."); *Turner v. Lieutenant Driver*, 848 F.3d 678, 687 (5th Cir. 2017) (explaining that "there was no clearly established First Amendment right to record the police" in 2015). The question is whether, as *Colten* put it, there is anything "more" here.

## C.

Molina and Vogel try to give us "more" in the form of three other theories. The first is a peaceful-assembly theory: although the protest may have been unruly, the gathering at Molina's property was not. The second is based on the bright green hats they wore, which they believe "proclaimed both their affiliation and their role within the larger demonstration." Their third theory is that the officers must have mistakenly thought they were protestors, which they say is good enough to allow

---

[2]It is not beyond the realm of possibility that a First Amendment right to observe police exists, but our Fourth Amendment cases like *Walker* and *Chestnut* do not clearly establish it. And it makes good sense why. It is one thing to conclude that officers cannot arrest someone passively standing by and watching as they do their job. After all, in the absence of interference, there is no crime in it. But it is another matter to say that watching is itself expressive. Expressive of what? Not even Molina and Vogel can provide a clear answer.

them to sue on a First Amendment retaliation theory. In the end, none of these theories work.[3]

1.

Timing is the basis for the peaceful-assembly theory. The officers did not fire the tear-gas canisters until after Molina and Vogel had reassembled with five to ten others. The argument is that the officers must have been reacting to their lawful assembly, not to the protest itself. There are two problems with this argument.

The first is that not every gathering falls under the umbrella of the First Amendment. The right of association presupposes that the purpose is to "engag[e] in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). And here, as the district court explained, the handful of people in Molina's yard were just trying to find "a safe meeting place away from the protest site." *See URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 12–13 (1st Cir. 2011) ("The constitutionally protected right of association . . . has never been expanded to include purely social gatherings."). Not all reasonable officers would have known the gathering was a protected assembly, particularly when they were dodging rocks and bottles just a few minutes earlier. *See Reichle*, 566 U.S. at 664; *see also Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) (explaining that demonstrations "lose their protected quality as expression under the First Amendment" when they "turn violent").

The second is that, even assuming the gathering in Molina's yard was protected, there is no evidence to suggest that it had anything to do with the officers'

---

[3]In their supplemental reply brief, Molina and Vogel argue they had a right of "access to information about how our public servants operate in public." We decline to address this argument because the officers have never had a chance to respond to it. *See Berg v. Norand Corp.*, 169 F.3d 1140, 1146 (8th Cir. 1999) ("refus[ing] to entertain [a] new argument" mentioned "for the first time in [the] reply brief").

decision to use tear gas. To succeed on their theory, Molina and Vogel must show that the officers "singled [them] out because" they lawfully reassembled elsewhere, regardless of what happened earlier. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) (quotation marks omitted). If something else was the motivation, however, then the reassembly was not a "but-for cause" of their injuries. *Nieves*, 139 S. Ct. at 1722 (quotation marks omitted).

If Molina and Vogel were "singled out," the district court suggested that, "at the least," it was because the officers "assumed" the gathering was a continuation of the earlier *un*lawful assembly. When they were patrolling the streets surrounding the protest, they were following orders from Lieutenant Dodge to break up the crowd and prevent the protestors from doing further harm. Molina even admitted that she "was assembled with [the protestors]" before moving to her house. The only reasonable inference to draw from these facts is that the officers were "merely carrying out their duty as they underst[ood] it." *Mitchell v. Kirchmeier*, 28 F.4th 888, 897 (8th Cir. 2022).

It makes no difference that the officers may have made a mistake. As we have explained, retaliatory animus cannot be the driving force whenever officers act based on their "understanding—however mistaken—of [their] official duties," even if the mistake turns out to be "unreasonable."[4] *Id.* at 896. So even if the officers "unreasonably believed" that the group was refusing to comply with their earlier directions to disperse, their official orders—not retaliatory animus—caused them to use the tear gas. *Baribeau*, 596 F.3d at 481.

2.

Returning to the protest itself, their second theory is that wearing the bright green hats expressed a "pro-protest" message. Recall that the hats said, "National

---

[4]An "unreasonable mistake," by contrast, does not shield officials from Fourth Amendment claims. *Baribeau*, 596 F.3d at 481.

Lawyers Guild Legal Observer." Although neither their color nor the words emblazoned on them directly conveyed a pro-protest message, Molina and Vogel claim that the act of wearing them sent a "particularized message." *Burnham v. Ianni*, 119 F.3d 668, 674 (8th Cir. 1997).

In First Amendment parlance, their theory is that wearing the hats was "expressive behavior" that "constitutes speech." *Id*. As we have recognized, "nonverbal conduct constitutes speech if it is intended to convey a particularized message and the likelihood is great that the message will be understood by those who view it." *Id.* And if wearing the hats is speech, qualified immunity is still available unless "every reasonable official would know" that the act conveyed a pro-protest (or other particularized) message. *District of Columbia v. Wesby*, 138 S. Ct. 577, 590–92 (2018).

Whether wearing the hats expressed a pro-protest message is a close call. On the one hand, knowing a bit more about the National Lawyers Guild could lead a reasonable officer to conclude that Molina and Vogel were there to support the protestors. On the other, the words "legal observer" could lead someone less knowledgeable to think they were neutral, there to make sure that neither the police nor the protestors broke the law. Under the latter view, the hats would identify their role, not express a "particularized message." *Burnham*, 119 F.3d at 674. The point is that not everyone would have understood the pro-protest message they were trying to convey. *See id.*

To the extent courts have recognized that clothing can convey a particularized message, the meaning was easily identifiable. Perhaps the most famous example was the anti-war activist who wore a jacket with the words, "Fuck the Draft." *See Cohen v. California*, 403 U.S. 15, 16 (1971). The message was clear: he strongly opposed "the Vietnam War and the draft" and wanted everybody to know it. *Id.*

The message in *Baribeau v. City of Minneapolis* was equally clear. 596 F.3d at 470–71. As part of an elaborate protest, the participants "dressed as zombies" by

wearing "white powder and fake blood on their faces and dark makeup around their eyes" and "broadcasted announcements such as 'get your brains here' and '[b]rain cleanup in Aisle 5.'" *Id.* at 470–71. During the protest, they "explained that they meant their actions as an anticonsumerist commentary." *Id.* at 471. So every reasonable officer would have understood their anti-consumer-culture message.

The point is that some symbols and words carry a clear message. "Fuck the Draft" unmistakably expresses an anti-war message. *See Cohen*, 403 U.S. at 16. Displaying a swastika carries a different kind of message, though its import is equally unmistakable. *See Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995). And in *Tinker v. Des Moines Independent Community School District*, the "black armbands" were a "silent symbol . . . of opposition to [the] Nation's part in the conflagration in Vietnam" and the wearers' "objections to the hostilities in Vietnam and their support for a truce." 393 U.S. 503, 504, 510 (1969).

We cannot say the same thing about bright green hats that say "National Lawyers Guild Legal Observer" on them.[5] There is no obvious pro-protest message. Or, at the very least, any pro-protest message is not "beyond debate," which means that this theory, like the others, cannot overcome qualified immunity. *Wesby*, 138 S. Ct. at 589 (quoting *al-Kidd*, 563 U.S. at 741).

3.

Their final theory is that, even if they did not *actually* engage in First Amendment activity, the officers must have thought they did. There is support for this argument, given that some of the officers thought they were protestors who had remained together and just moved a couple of blocks away. Citing *Heffernan v. City*

---

[5]Molina and Vogel also cite *Hurley*, but it involves "the protected expression that inheres in a parade," not in specific articles of clothing. 515 U.S. at 569. It could not have clearly established a First Amendment right to wear the bright green hats.

*of Paterson*, 578 U.S. 266, 268 (2016), Molina and Vogel argue that even a mistaken belief about what they did is good enough because perception is what counts for a constitutional claim like this one.

*Heffernan* involved the "demot[ion] [of] an employee because [an] official [incorrectly] believed . . . that the employee" had participated "in constitutionally protected political [First Amendment] activity." *Id.* at 268. The Supreme Court concluded that the "demotion" was "what count[ed]," even though the employee "*had not engaged* in . . . protected activities." *Id.* at 270–71. Molina and Vogel argue the same logic should apply here.

The problem with this theory is timing. The Supreme Court decided *Heffernan* months *after* the events in this case took place. 578 U.S. at 266. Even if the rule it adopted would otherwise apply here, no "controlling authority" or "robust 'consensus of cases of persuasive authority'" clearly established the right before early 2016—too late for it to matter here. *See Wesby*, 138 S. Ct. at 589–90 (quoting *al-Kidd*, 563 U.S. at 741–42); *see also Heffernan*, 578 U.S. at 275 (Thomas, J., dissenting) ("[F]ederal law does not provide a cause of action to plaintiffs whose constitutional rights have not been violated . . . .").

\* \* \*

Having considered multiple possibilities, we conclude that none of them work. Qualified immunity prevents Molina and Vogel from recovering on their First Amendment retaliation claims.

### III.

Groce's First Amendment retaliation claim, on the other hand, fares better. Recall that he followed the BEAR on a bicycle and then yelled, "[g]et the fuck out of my park." His "[c]riticism of [the] officers, even with profanity, is protected speech." *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 985 (8th Cir. 2019); *see*

-12-

*Hoyland*, 869 F.3d at 656 (citing *Hill*, 482 U.S. at 461). And at least one case clearly established the right to be free from retaliation in those circumstances. *See Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) (stating that "criticizing a police officer and asking for his badge number is protected speech"); *see also Hill*, 482 U.S. at 461 ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.").

## A.

To counter what appears to be a clearly established constitutional right, the officers claim this case is different. In their view, Groce acted in an aggressive and threatening manner, which then gave them arguable probable cause to act. Even assuming that the presence of arguable probable cause is an absolute defense to a First Amendment retaliation claim—a question we need not decide today—their position depends on reinterpreting the facts in a "light most favorable to" them, not Groce. *Engesser v. Fox*, 993 F.3d 626, 629 (8th Cir. 2021) (stating that we must view the facts "in [the] light most favorable to [the plaintiff]").

Under the "plaintiff-friendly version of the facts," by contrast, there was no probable cause, arguable or otherwise, to take any action against Groce. *N.S. v. Kansas City Bd. of Police Comm'rs*, 933 F.3d 967, 969 (8th Cir. 2019). The officers cannot identify any crime that he allegedly committed. Yet they launched a tear-gas canister at him a few minutes after video footage "depict[ed] a calm scene," even though they had no evidence "that [he] was armed or otherwise presented any threat to the [officers] inside their armored vehicle." We have no jurisdiction to reinterpret these facts, which support the denial of qualified immunity. *See Berry*, 900 F.3d at 1021.

## B.

Setting qualified immunity aside, the officers also challenge whether the evidence is specific enough to allege that any of them *individually* violated Groce's

-13-

First Amendment rights. He cannot identify who launched the tear-gas canister, so in their view, no one can be held liable for his injuries.

1.

Liability under section 1983 is "personal." *White v. Jackson*, 865 F.3d 1064, 1080–81 (8th Cir. 2017). By personal, we mean that "a plaintiff must show each individual defendant's personal involvement in the alleged violation." *Id.* It does not follow, however, that a plaintiff must be able to "*personally* identify his assailant[] to avoid summary judgment." *Id.* at 1081 (emphasis added).

What we know from the evidence, viewing it in Groce's favor, is that someone launched a tear-gas canister from the BEAR. We also know that seven officers were riding in it at the time: Michael Mayo, Joseph Mader, William Wethington, Mark Seper, Daniel Book, Lance Coats, and Joseph Busso. All of them "had access to [chemical] munitions," which could "be released from one of many portholes of [the] armored vehicle[,] either by hand or using a launcher."

At this stage, there is enough evidence to establish the "personal involvement" of everyone in the BEAR. *Id.* at 1081. To be sure, Groce could not see who launched the tear-gas canister. But with multiple "officers present," the jury could find that each one of them participated in the decision or that one did it "while the other[s] failed to intervene." *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1342 (11th Cir. 2007). Under these circumstances, the claims against the individual officers can proceed.

2.

Not so for Lieutenant Dodge. Although Groce alleges that he was "deliberately indifferent to or tacitly authorized the offending acts," we disagree. *Barton v. Taber*, 908 F.3d 1119, 1125 (8th Cir. 2018) (quotation marks omitted).

-14-

Unlike the individual officers in the BEAR, Lieutenant Dodge had no "personal involvement" in the violation. *White*, 865 F.3d at 1081. Supervisory status on its own is not enough. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (stating that "vicarious liability is inapplicable to *Bivens* and § 1983 suits"); *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001) ("A supervisor may not be held liable under § 1983 for the constitutional violations of a subordinate on a respondeat superior theory."). And when the officers fired the tear-gas canister at Groce, Lieutenant Dodge was in another vehicle patrolling a different area. To be sure, he gave an order to "use chemical munitions to disperse" the crowd. But he had no notice that his lawful order was "likely to result in a constitutional violation" or that his "supervision [under the circumstances] w[as] inadequate." *Barton*, 908 F.3d at 1125.

## IV.

We accordingly affirm the denial of summary judgment on Groce's First Amendment retaliation claim, but only against the individual officers in the BEAR. We otherwise reverse and remand for the entry of judgment on all other claims.

BENTON, Circuit Judge, dissenting in part and concurring in part.

The panel opinion here holds that observing and recording police-citizen interactions was not a clearly established First Amendment right on August 19, 2015. This conclusion violates this circuit's "cardinal rule . . . that one panel is bound by the decision of a prior panel." ***Mader v. United States***, 654 F.3d 794, 800 (8th Cir. 2011) (en banc). "One panel of this Court is not at liberty to disregard a precedent handed down by another panel." ***Drake v. Scott***, 812 F.2d 395, 400 (8th Cir. 1987).

## I.

Two cases bind this court: *Chestnut v. Wallace*, 947 F.3d 1085 (8th Cir. 2020), and *Walker v. City of Pine Bluff*, 414 F.3d 989 (8th Cir. 2005). Both cases

found a clearly established First Amendment right to observe police officers that existed before the events precipitating this case. *See Chestnut*, 947 F.3d at 1090; *Walker*, 414 F.3d at 993.

*Walker*, the earlier case, held that observing police officers *could not* be outlawed. *Id.* This court denied qualified immunity to an officer who arrested an individual for "silently watching the [police] encounter from across the street with his arms folded in a disapproving manner." *Id.* at 992. The *Walker* case analyzed the legal effect of only this silent observation. *Id.* This court held that the officer lacked probable cause because it was "clearly established" that a peaceful onlooker could not be arrested "for obstruction of governmental operations *or for any other purported crime*." *Id.* at 993 (emphasis added). The state, said this court, did not just *happen* to permit officer-watching, it *had* to permit it.

This court detailed the nature and origin of *Walker*'s clearly established substantive right in *Chestnut v. Wallace*, 947 F.3d 1085. This court there reaffirmed the constitutional origin of the "clearly established right to watch police-citizen interactions at a distance and without interfering." *Chestnut*, 947 F.3d at 1091 ("[I]f the constitution protects one who records police activity, then surely it protects one who merely observes it."). And it confirmed that the First Amendment gives rise to this right by citing seven First Amendment cases, including two from this circuit.[6] *Id.* at 1090–91, *citing Thurairajah v. City of Fort Smith*, 925 F.3d 979, 985 (8th Cir. 2019) ("[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out," *quoting Hartman v. Moore*, 547 U.S. 250, 256 (2006)); *Hoyland v. McMenomy*, 869 F.3d 644, 655 (8th Cir. 2017), *overruled as to causation element by Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019), *as recognized by Laney v. City of St. Louis*, ___ F.4th ___, 2023 WL 116837, at *3 n.2 (8th Cir. Jan. 6, 2023); *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017) ("The First Amendment protects the public's right of access

---

[6]The dissent "agree[d] with the court's characterization of those [First Amendment] cases" as establishing that the "right exists." *Chestnut*, 947 F.3d at 1096 (Gruender, J. dissenting).

to information about their officials' public activities."); *id.* (because "there is the right for the eye to see or the ear to hear," the First Amendment also protects the right to record police); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012) (First Amendment protects "gathering . . . information about the affairs of government," including secret audio recordings of police officers); *id.* ("[T]he First Amendment goes beyond protection of the press and self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *quoting* **First Natl Bank of Boston v. Bellotti**, 435 U.S. 765, 783 (1978)); *Glik v. Cunniffe*, 655 F.3d 78, 81 (1st Cir. 2011) ("It is firmly established that the First Amendment's aegis extends further than the text's proscription on laws 'abridging the freedom of speech, or of the press,' and encompasses a range of conduct related to the gathering and dissemination of information."); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) ("The First Amendment protects the right to gather information about what public officials do on public property."); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (authorizing § 1983 claims against an officer who  attempt[ed] to prevent or dissuade [plaintiff] from exercising his First Amendment right to film matters of public interest.).

*Walker* and *Chestnut* correctly attribute this right to the First Amendment. The First Amendment protects the right to protest "by silent and reproachful presence." *Brown v. Louisiana*, 383 U.S. 131, 141–42 (1966) (opinion of Fortas, J., announcing the judgment of the Court). *See also id.* at 148–49 (Brennan, J., concurring in the judgment); *id.* at 150–51 (White, J., concurring in the result). *Walker* and *Chestnut* concerned silent and reproachful police-observation. *See, e.g.*, *Walker*, 414 F.3d at 992 (plaintiff watched police "with his arms folded in a disapproving manner"); *Chestnut*, 947 F.3d at 1087 (plaintiff's desire to observe police arose because "there had been a lot of difficulty in citizen/police interaction as of late" (quotation omitted)). *Cf.* *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 568–69, 579 (1995) (a parade is First Amendment-protected expressive conduct); *Spence v. Washington*, 418 U.S. 405, 410 (1974) (context determines whether conduct is expressive, and the Kent State tragedy

contextualized an upside-down flag with a peace sign); ***Baribeau v. City of Minneapolis***, 596 F.3d 465, 476, 477 (8th Cir. 2010) (the First Amendment protected zombie costumes even though the anti-consumerism message was only clear after protestors explained their meaning).[7]

The panel opinion here tries to avoid *Chestnut* and *Walker*'s First Amendment conclusions based on what one Supreme Court case suggests. In *Colten v. Kentucky*, 407 U.S. 104 (1972), the Court found that "appellant was not engaged in activity protected by the First Amendment" because "[h]e had no constitutional right to observe the issuance of a traffic ticket" and, as the state court found, "appears to have had no purpose other than to cause inconvenience and annoyance." ***Colten***, 407 U.S. at 109.

Again, this violates the prior-panel rule. This court has established *Colten*'s reach in this circuit. In *Hoyland v. McMenomy*, this court articulated two facts— and identified one later case—that distinguished *Colten*. ***Hoyland***, 869 F.3d at 656 ("[T]the officers' reliance on *Colten* is misplaced" and plaintiff was engaged in "protected activity."). Unlike the *Colten* appellant, the *Hoyland* plaintiff was at home (rather than by a busy highway) and brought a § 1983 claim (rather than a direct attack on a state statute). ***Id.*** This case contains both factors underlying *Hoyland*'s conclusion that "reliance on *Colten* [was] misplaced." ***Id.*** Molina and Vogel were (allegedly) teargassed at their home where public safety was not threatened, and they bring § 1983 claims rather than challenges to state criminal law.

---

[7]The First Amendment's broad sweep is "the proudest boast of [] free speech jurisprudence." ***Matal v. Tam***, 137 S. Ct. 1744, 1764 (2017). It protects people of all stripes. *See, e.g.*, ***Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n***, 138 S. Ct. 1719, 1741–42 (2018) (Thomas, J., concurring in part and concurring in the judgment). Narrowing its scope undermines "bedrock principles of [the Supreme Court's] free-speech jurisprudence" and "should not pass without comment." ***Id.*** at 1740.

More importantly, *Hoyland* recognized that the Supreme Court had already cabined *Colten* in *City of Houston v. Hill*, 482 U.S. 451 (1987). The Court there explained that the *Colten* ordinance "prohibit[ed] only disorderly conduct or fighting words" and survived the First Amendment challenge only because it "infringe[d] no protected speech or conduct." **Hill**, 482 U.S. at 465 & n.14, *quoting* **Colten**, 407 U.S. at 108 (second alteration in original). Laws prohibiting "words or conduct that annoy or offend" officers, by contrast, ran afoul of the First Amendment. **Id.** at 465. *Hill*'s protection for criticizing officers—and *Hoyland*'s fidelity to *Hill*— underpinned *Chestnut*'s holding that "if officers cannot seize someone who criticizes or curses at them while they perform official duties, they cannot seize someone for exercising the necessarily included right to observe the police in public from a distance and without interfering." **Chestnut**, 947 F.3d at 1091, *citing* **Hoyland**, 869 F.3d at 654.

Finally, *Chestnut*'s recognition of a clearly established First Amendment right to observe police interactions was a holding, not dicta. This court said so:

> Other legal authorities fully support *our holding* that the right here was clearly established. Every circuit court to have considered the question has held that a person has the right to record police activity in public. [citation omitted]. Four circuits had so decided by the time of the events in question here. [citations omitted]. This robust consensus of cases of persuasive authority suggests that, if the constitution protects one who records police activity, then surely it protects one who merely observes it—a necessary prerequisite to recording.

**Chestnut**, 947 F.3d at 1090 (emphasis added).[8]

---

[8]In *Chestnut*, this court did not confine this clearly established right to an expressive-conduct strand of First Amendment jurisprudence. The First Amendment captures more than expressive conduct. *See* **Chestnut**, 947 F.3d at 1090, *citing* **Fields**, 862 F.3d at 359 (holding that the First Amendment right to record police stems from "the right for the eye to see or the ear to hear"). *See also* **Brown**, 383 U.S. at 141–42, 148–49, 150–51 (Fortas, J., announcing the judgment

II.

The panel opinion here attributes that clearly established right to the Fourth, rather than First, Amendment. In doing do, it underappreciates the interplay between First and Fourth Amendment rights in this circuit's precedent.

Police may not seize a person without suspecting or believing that the person committed or is about to commit a crime. *See* **Waters v. Madson**, 921 F.3d 725, 736 (8th Cir. 2019). The Fourth Amendment sets two thresholds, "reasonable suspicion" for a detention and "probable cause" for an arrest. ***Id.*** Thus the Fourth Amendment deems it "unreasonable" to seize someone solely for conduct not suggesting a crime. *See* **United States v. Cortez**, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). Legal conduct generally does not suggest a crime and therefore does not, without more, furnish the suspicion or belief necessary for a seizure. *See* **Illinois v. Wardlow**, 528 U.S. 119, 125 (2000) ("[R]easonable suspicion must be based on commonsense judgments and inferences about human behavior.").

Conduct can be legal—and therefore insufficient, standing alone, to justify a seizure—in one of two ways: First, the conduct might *happen to be* legal in a certain jurisdiction. In a city that permits skateboarding, for example, an officer cannot seize an individual merely for riding a skateboard because, without more, that legal conduct would not indicate "that criminal activity may be afoot." *See* **United States v. Arvizu**, 534 U.S. 266, 273 (2002) (quotation omitted). Second, some conduct does not raise red flags because it *must always be* legal. In a traditional public forum, an officer cannot seize a person merely for praying the Rosary, pleading the Fifth, or even flying a Nazi flag because that conduct is constitutionally protected, cannot

_____

of the Court, supported in concurrences by Brennan, J., and White, J.) ("[S]ilent and reproachful presence" is protected by the First Amendment).

-20-

be illegal, and does not, without more, suggest criminal activity.[9]  *See R.A.V. v. St. Paul*, 505 U.S. 377, 381 (1992) (Nazi swastikas could not be outlawed "solely on the basis of the subjects the speech addresses").  *See also Baribeau*, 596 F.3d at 479 (narrowing a state prohibition to exclude First Amendment-protected activity and holding that "there was no probable cause to arrest the plaintiffs for engaging in protected expressive conduct").

*Chestnut* and *Walker* found it clearly established that peacefully observing a police officer did not furnish reasonable suspicion (or probable cause) of criminal activity and therefore did not justify a Fourth Amendment seizure.  The panel opinion today presumes that peaceful police-observation fits the first category of legal conduct insufficient for a search or seizure—conduct that just happens to be legal.   But this circuit's precedent clearly establishes that peaceful police-observation *must be* legal—it is constitutionally protected First Amendment activity. *See Chestnut*, 947 F.3d at 1090; *Walker*, 414 F.3d at 993.

*Chestnut* and *Walker* were indeed Fourth Amendment cases.  But the Fourth Amendment makes it unreasonable to arrest or detain someone for conduct that, because the constitution protects it, could never be criminal.  *Chestnut* and *Walker*, in reaching their Fourth Amendment holdings, clearly established that the First Amendment protects peaceful police-observation in this circuit.   This panel is "powerless" to overturn those holdings.  *Kostelec v. State Farm Fire & Cas. Co.*, 64 F.3d 1220, 1228 n.8 (8th Cir. 1995).  Because Molina and Vogel were engaged in protected First Amendment activity, their First Amendment claims should be allowed to proceed.

---

[9]True, context may render suspicious otherwise-innocuous activity.  *Cortez*, 449 U.S. at 417–18 ("[T]he totality of the circumstances—the whole picture—must be taken into account.  Based upon that whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.").

I dissent from Part II of the panel opinion here, but fully concur in Part III.

_____